UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

AHMON RASHARD HOGG, JR.

Defendant.

)
)
)
)
)
)
)
)
)
)

No. CR25-148-JLR

DEFENSE SENTENCING
MEMORANDUM

What would someone do if they were 21 and thought they might die tomorrow? If they thought that making it to 25 was a pipe dream, and all they had been promised was this moment and maybe the next? Would they settle in, borrow money they didn't have, enroll in a GED program, ask school officials or other authority figures—people who had consistently let them down and communicated to them that they were a problem—for help? Maybe. Or would they instead live like their actions had no consequences, like the only things that they would get in life are what they could reach out and take? Like tomorrow was never going to happen.

**A.      A Life of Many Hardships and Few Opportunities**

Ahmon Hogg never had a chance. Born in Houston, Texas, and growing up in the notorious Fifth Ward, statistics shaped his trajectory at least as much as any individual choice. Murder rates in the Fifth Ward are over five times the national average, and almost double that of Houston. Exhibit 1 (Z. Lynch Report) at 7, filed separately under seal. Ahmon, at an early age, was exposed to violence and drugs in the

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 1

community and at home. Exhibit 1 at 2. Ahmon's father struggled with PCP addiction and was frequently absent from his son's life during critical periods in his upbringing. PSR at ¶ 107; Exhibit 1 at 2. At nine years old, Ahmon was injured from a gunshot for the first, but not the last, time in his life. Exhibit 1 at 3. At an age where many children still struggle to deal with the consequences of death in the abstract, or after the loss of a beloved pet, Ahmon had spoken to the deceased victim of that shooting—the one where Ahmon was grazed with a bullet—just minutes before he died and before Ahmon later saw his dead body. Exhibit 1 at 3.

Apart from his mother, Ahmon has never had a safe refuge. His father was too overcome by his addiction to be a role model to Ahmon. Given the opportunity, he took away what little cash Ahmon had been given by his mother and used it to buy drugs. Exhibit 1 at 3. When 10-year-old Ahmon, after being nearby yet another shooting and fearing for his life, asked his father to drive him and his cousin to safety away from his grandmother's apartment where the shooting was happening, Ahmon's father was too high to drive and crashed the car. Exhibit 1 at 3. Instead of apologizing for his role in failing to protect and ultimately endangering his son and nephew, Ahmon's father blamed Ahmon for "losing his car" and attributed the loss to Ahmon's fear. Exhibit 1 at 3.

After this car crash, Ahmon lost contact with his father and his paternal siblings for years. Exhibit 1 at 3–4. When he saw his father again, years later, the topic of the car accident came up with Ahmon's father blaming him for it. Ahmon lost his temper and lashed out at him, calling him a "wet head"—slang for a PCP addict. Rather than continue to be in a car with his father, he walked for two hours to his grandmother's house. Exhibit 1 at 4. Years later, when his paternal grandmother went missing, suffering from dementia, Ahmon's father showed up where his whole family was gathered. He showed up physically, but he was too high to talk. Ahmon again lost his

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

patience, yelling at him for his failure to be there for his own mother. This led to a physical confrontation between the two, and a friend of Ahmon's father, a six-foot-five man, intervened and physically assaulted Ahmon. Because Ahmon was, by then, suffering from yet another gunshot wound, he was unable to defend himself.

Ahmon is now 22 years old. In the eyes of this Court, he is a man, responsible for his decisions. But when was that elusive period where he got to be a boy, make mistakes, and then be guided back to a safe harbor with compassion by a responsible person in his life? Ahmon's mother tried, intervening to make sure that he was appropriately medicated for his ADHD diagnosis, and to establish a behavior-intervention plan. Exhibit 1 at 6. But when it came time to implement these plans, the stretched-thin system not only failed to provide him adequate services, a truancy officer entrusted with serving children assaulted Ahmon and then falsely accused Ahmon of assault. Exhibit 1 at 6. He went to juvenile detention and faced false charges until his mother contacted the Texas Attorney General and footage from the incident exonerated Ahmon. Exhibit 1 at 6. But, by then, any illusion that Ahmon may have had that the system was there to help him was gone. Exhibit 2 (K. Trujillo Report) at 5, filed separately under seal ("Over and over again, Ms. Braggs witnessed a system meant to support her son instead treat him like a criminal.").

While Ahmon was treated for his ADHD, he has never been diagnosed with PTSD. As Mitigation Specialist Kelly Trujillo describes in her report, there is significant overlap in the presentation of trauma symptoms with that of ADHD. Exhibit 2 at 5–6. Ahmon's history and personal experience with trauma and death have left him hypervigilant and dysregulated. Exhibit 2 at 6–7. As a young person under 25, impulse control and judgment were always going to be impaired. Exhibit 2 at 8. Combined with the impacts of persistent trauma and ADHD, Ahmon is just not operating with the same ability to control his impulses as others his own age.

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

Ahmon's trauma is not abstract: The list of friends and family members he has lost, many to murder and many in the last few years, is lengthy to recount—not to mention losing his older brother to a lengthy prison sentence when he was only 13 years old. Exhibit 1 at 10–12. One could divide up and portion out Ahmon's suffering, and it would be enough to seriously impact or even derail the lives of several people. But it all happened within the span of one short life.

When Ahmon was 17, he was shot in the ankle with an AR-15 rifle, leading him to have 12 surgeries and miss substantial amounts of school. PSR ¶¶ 115–116; Exhibit 1 at 8–9. Ahmon had to attend physical therapy and relearn how to walk. Exhibit 1 at 9. Although the school was supposed to send someone to his home to help Ahmon finish his credits, he was instead withdrawn from the school. *Id.* This is also when Ahmon began to take Oxycodone to manage the pain, and that use persisted past the expiration of his prescription. PSR ¶ 126. So, on top of poverty, untreated trauma, neglect, and systemic failure, Ahmon's injury added drug addiction to the mix of factors weighing against him.

Is it really surprising that Ahmon eventually turned to a gang? When his father let him down and his school consistently treated him as a problem to be fixed, why not turn to a group that at least purported to protect its members and provide a sense of belonging? Ahmon didn't join a gang because there was something inherently criminal about him that wanted to live that kind of lifestyle. In another world, where he was born into privilege, that group that offered belonging might have been the Scouts, a rowing team, or within a family-owned business. Football and sports almost filled that role for Ahmon, but problems at school and being shot in the ankle destroyed that community. Exhibit 1 at 8.

Ahmon was born into a life where educational and extracurricular opportunities were limited. Money couldn't buy Ahmon the specialized attention that he needed or

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 4

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

get school officials to pay attention to him. And if Ahmon was going to access money from an ATM, it was not going to be through using his debit card or that of a wealthy relative. This does not excuse his actions, but it helps provide the context of how his choices were born out of different circumstances than for other people before the Court for sentencing.

**B. The Offense**

When he first became involved in the instant offense, Ahmon—as he reported to counsel—was living in a hotel with his mother. What he saw in these ATMs was an opportunity to feed his family and improve their circumstances. While the government has not filed its memo in Mr. Hogg's case yet, it may decide to focus on some of the same issues as it did in its sentencing memo for the co-defendant—using images from Ahmon's social media to portray him as a greedy and brazen. *See* Dkt. 59 at 3, 7. It may focus on the harm he did to "ordinary, hardworking citizens" and "well-meaning, hardworking people." Dkt. 59 at 7–8.

The case against Ahmon is easy to make: He scared people, and in at least one case he physically hurt someone. He took money from banks, and he did it multiple times. These ATM technicians, ordinary people, were just trying to live their lives and Ahmon hurt them by his actions. But Ahmon is also an ordinary person, albeit one who has suffered an enormous amount of hurt in his life. And, through the felony conviction and the eventual sentence, he will pay a price. But so will the rest of the people in Ahmon's life.

While Ahmon was taking money from these ATMs, he was suddenly gaining access to more resources than he had ever seen in his entire life. Food, shelter, and survival were no longer questions. Is it so surprising that a young man, barely out of boyhood, would flaunt some of that newly acquired wealth on social media? Except for the means by which Ahmon acquired this money, are his actions that different from

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 5

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

what can be seen at any expensive, private university where young adults from wealthy families fill the parking lots with luxury cars purchased for them by their relatives and wear expensive designer clothes to attend classes? Young people flaunt what they have, regardless of how they acquire it. Many of them grow out of this behavior. Ahmon's social media is not evidence of his incorrigibility or his being a menace to society, it is yet one more example of his ordinary and predictable youthful behavior. Like other youths, he will grow out of the impulsiveness that led him to seek validation from peers through social media.

Ahmon is a father of five. PSR ¶¶ 110–111. His five young children are currently growing up without him and will likely do so for the near future. Ahmon's life was shaped by the effective absence of his father within it. Losing his older brother to prison also had a negative impact. Ahmon's life and choices, like those of his father, are going to have an impact on his children.

Ahmon is still finding out what his place is in the world, like many 22-year-olds. He hopes to gain skills and eventually apply himself to a career that he can use to support himself and his children. Exhibit 1 at 13. Like others his age, he is still trying to figure out exactly what that will look like, but HVAC or electrician training, in addition to finishing his GED, are two routes he hopes will open doors for him that will lead to self-sufficiency and to eventually owning his own business. Exhibit 1 at 13; PSR ¶ 112. Because of the impact of this case, he will have years to finish those programs prior to his release.

### C. A Sufficient Sentence

The defense can ask for the low end of the guidelines: 87 months in custody. The defense does so while recognizing that the Court imposing this sentence—higher than both the median and average JSIN numbers for the relevant cell data—would have the net impact of driving up the sentencing numbers for future defendants once Ahmon's is

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 6

included in future datasets. Although the plea agreement prevents Ahmon from asking for an average or median sentence according to the JSIN, the net benefit to him was a global resolution of charges. But the low-end sentence should not be treated as a windfall—it is actually the sentence least likely to create a statistical disparity among the relevant dataset.

In its recommendation, Probation attributes Ahmon's actions to greed, describing his social media posts, spending habits, and flaunting of currency as supportive of this assessment. Probation also argues that its recommendation, the high end of the guidelines, was primarily aimed at deterrence and protecting the community. The defense respectfully disagrees with this assessment. Social media is the most superficial, and often distorted, view of someone's life. People post triumphs, vacations, and graduations on social media. They do not, as often, post traumas, setbacks, and insecurities. Ahmon's truth is not on Instagram.

If the Court sentences Ahmon to 87 months, it will still impact his remaining in custody until he is past the emerging adulthood era of development. Exhibit 2 at 8–9. He will be a different person by the time he is released. His prefrontal cortex will finish developing around age 25, while he is in prison. He will, gradually, begin to look back on this time in his life with the perspective of a fully-grown, rather than emerging, adult. A high-end sentence is not necessary to achieve that goal. More time in prison will only delay the time when Ahmon will eventually have to rejoin the world, get a job, and be there for his children. A longer sentence will not help Ahmon or protect the community.

The press coverage associated with Ahmon's arrest has already had the effect of demonstrating to the community that targeting ATMs will lead to swift capture and prosecution. There is a certainty of punishment that already exists. No additional deterrence value exists from sentencing Ahmon to a high-end guideline sentence over a

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**

low-end sentence. Other desperate people who might consider targeting ATMs are not going to be deterred to a greater degree by this Court choosing one prison sentence over another, especially when the gap between the request of the parties is relatively narrow. Eighty-seven months is a substantial and serious sentence, especially for someone as young as Ahmon.

### D. Conclusion

Under the circumstances of the case, given Ahmon's tragic history and characteristics, his need for vocational training and specialized medical care, and to avoid creating sentencing disparities with the national median and average sentences for this offense, the defense requests that the Court impose a within-guidelines sentence of 87 months, followed by a period of supervised release. In an ideal world, prison would not be where Ahmon would get the assistance that he has needed his entire life. But Ahmon's life has been a constant reminder that not everyone gets to experience the ideal life. Most, like Ahmon, have to do the best they can in the situation that they find themselves in. An 87-month sentence is the best outcome to the tragic situation that this case presents.

DATED this 21st day of April 2026.

Respectfully submitted,

s/ *J. Leonardo Costales*
Assistant Federal Public Defender
Attorney for Ahmon Hogg

DEFENSE SENTENCING MEMORANDUM
(*United States v. Hogg*, No. CR25-148-JLR) - 8

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, WA 98101**
**(206) 553-1100**